

# IN THE
# TENTH COURT OF APPEALS

### No. 10-07-00363-CR

**STEVEN DOUGLAS FREEMAN,**

**Appellant**

**v.**

**THE STATE OF TEXAS,**

**Appellee**

**From the 19th District Court
McLennan County, Texas
Trial Court No. 2007-297-C2**

## OPINION

A jury convicted Steven Douglas Freeman of felony driving while intoxicated, and the trial court sentenced him to forty years in prison. Freeman contends that the trial court abused its discretion by (1) excluding the testimony of his expert witness; (2) refusing to give the jury a spoliation instruction; and (3) declaring a juror disabled. We affirm.

## FACTUAL BACKGROUND

Officer David Westmoreland stopped Freeman for traveling through a gas station without stopping, making turns without signaling, drifting onto the shoulder, and crossing over the center stripe. Freeman pulled over appropriately. Westmoreland detected an odor of alcohol emitting from Freeman's breath and noticed that Freeman's eyes were glassy. Westmoreland located an open can of beer under the passenger's seat and two unopened beer cans behind the bench seat of the truck. The female passenger claimed ownership of the open beer can.

Westmoreland conducted three field sobriety tests. The horizontal and vertical nystagmus tests both revealed lack of smooth pursuit or involuntary jerking of the eyes. Freeman could not perform the heal to toe test as instructed, specifically failing to maintain the instructional phase or walk heal to toe, making an improper turn, and stepping offline. During the one leg stand, Freeman used his arms for balancing and put his foot down twice, but completed the test. The stop was videotaped.

Westmoreland concluded that Freeman was impaired, and arrested Freeman. Freeman was videotaped at the jail while receiving warnings and agreeing to an intoxilyzer test. These tests, taken about an hour and a half after Westmoreland initiated the traffic stop, yielded results of 0.146 and 0.145.

Before trial, the tape of the field sobriety tests was recorded over pursuant to department policy. The jail tape, however, was available and was played for the jury at trial.

## SPOLIATION INSTRUCTION

In his second point, Freeman challenges the trial court's refusal to give the jury a spoliation instruction regarding the missing tape of the field sobriety tests.

### Standard of Review

"[U]nder the Due Course of Law provision of article I, section 19 [of the Texas Constitution], the State has a duty to preserve material evidence which has apparent exculpatory value, encompassing both exculpatory evidence and evidence that is potentially useful to the defense." *Pena v. State*, 226 S.W.3d 634, 651 (Tex. App.—Waco 2007, pet. granted).[1] An adverse inference instruction is the appropriate remedy for loss or destruction of evidence. *Id.* at 655. We review a trial court's refusal to submit a requested jury instruction for abuse of discretion. *See Wesbrook v. State*, 29 S.W.3d 103, 122 (Tex. Crim. App. 2000).

### Preservation

Freeman argues that the State had a duty to preserve the tape and the jury was entitled to an instruction advising them that an adverse inference may be drawn from the State's destruction of the tape. The State contends that Freeman's request for a spoliation instruction is insufficient to preserve his complaint for appellate review, having failed to object on constitutional grounds.

[1]    Citing *Gibson v. State*, 233 S.W.3d 447 (Tex. App.—Waco 2007, no pet.), the State argues that *Pena* is inapplicable to cases where the evidence does not form the basis of the offense. We are not persuaded by this argument. In *Pena*, we held that the State had a duty to preserve marihuana plants in a possession case. *See Pena v. State*, 226 S.W.3d 634, 654-55 (Tex. App.—Waco 2007, pet. granted). In *Gibson*, we declined to extend *Pena* to the failure to preserve any of Gibson's blood sample for independent testing. *See Gibson*, 233 S.W.3d at 454. However, in *Terrell v. State*, 228 S.W.3d 343 (Tex. App.—Waco 2007, pet. granted), we specifically applied *Pena* to the "State's failure to preserve the audiotape and videotape of Terrell's police interview and the audiotape of the victim's police interview." *Terrell*, 228 S.W.3d at 345-47. *Pena* similarly applies to the facts of this case.

In *Carroll v. State*, 266 S.W.3d 1 (Tex. App.—Waco 2008, no pet. h.), Carroll challenged the trial court's refusal to submit a spoliation instruction to the jury "concerning the State's failure to preserve videotapes of Carroll's stop and arrest." *Carroll*, 266 S.W.3d at 3. Carroll had neither "raise[d] a Due Course of Law complaint in the trial court" nor requested a spoliation instruction. *Id*. His complaint was not preserved.

Here, Freeman did not raise a constitutional claim in the trial court, but unlike Carroll, he did request a spoliation instruction based on destruction of the tape. His instruction raised the issue of the State's duty to preserve the tape.[2] He has preserved his issue for appellate review.

---

[2] Freeman's proposed spoliation instruction states:

> During the trial of this case, the issue has arisen whether or not the state was in possession of a video tape [sic] taken of the defendant either before and during the detention and arrest, and having said possession, either destroyed or allowed the breath sample and/or simulator solution [videotape] to be destroyed.
>
> Our law provides that the capacity to preserve evidence is equivalent to the actual possession of the evidence.
>
> When the State intentionally destroys evidence, and when that fact is established, you the jury are instructed that you may draw the inference that the evidence destroyed was unfavorable to the state and would have been favorable to the defendant.
>
> Accordingly, should you believe by a preponderance of the evidence that the State of Texas had the capacity to preserve the videotape of the defendant, then you may infer that any such evidence would have produced a result favorable to the defendant.

In *Pena*, we offered two examples of spoliation instructions:

> You may take note of the fact that the state had obtained bodily fluid samples from the body of the victim, that such samples are, as a matter of law, material evidence in that scientific tests are available which may exclude an individual from that class of persons who could have committed the crime, that the state lost or destroyed the samples, and that the defendant therefore did not have an opportunity to conduct such tests. The fact

## Analysis

Freeman's right to a spoliation instruction depends on: (1) whether the evidence would have been subject to discovery or disclosure; (2) whether the State had a duty to preserve the evidence; and (3) if the State breached a duty to preserve, what consequences should flow from the breach. *Pena*, 226 S.W.3d at 651.

There is no doubt that the tape of the sobriety tests was subject to disclosure and the State failed to preserve the tape. *See Terrell v. State*, 228 S.W.3d 343, 346 (Tex. App.—Waco 2007, pet. granted) (audiotape and videotape of an interview with Terrell and an audiotape of an interview with the victim were subject to disclosure and were not preserved). Freeman's expert, forensic toxicologist Dr. Gary Wimbish, suggested that Freeman's appearance on the jail tape was not consistent with his intoxilyzer results and found it "unfortunate" that the tape of the sobriety tests was unavailable. The State

---

that the state lost or destroyed the samples does not, in itself, require that you acquit the defendant. It is, however, one factor for you to consider in your deliberations.

…

The State has a duty to gather, preserve, and produce at trial evidence which may possess exculpatory value. Such evidence must be of a nature that the defendant would be unable to obtain comparable evidence through reasonably available means. The State has no duty to gather or indefinitely preserve evidence considered by a qualified person to have no exculpatory value, so that an as yet unknown defendant may later examine the evidence.

If, after considering all of the proof, you find that the State failed to gather or preserve evidence, the contents or qualities of which are in issue and the production of which would more probably than not be of benefit to the defendant, you may infer that the absent evidence would be favorable to the defendant.

*Pena v. State*, 226 S.W.3d 634, 656 (Tex. App.—Waco 2007, pet. granted). Freeman's instruction contains similarities to the instructions offered in *Pena* and, unlike in civil cases, was not required to contain "substantially correct wording." *See id.*; TEX. R. CIV. P. 278.

admitted that "perhaps [Wimbish's] testimony could be helpful" to the jury if he had reviewed a tape of the sobriety tests:

> Had there been something with the field sobriety test and [Wimbish] wanted to say they were done wrong or that the officer was misusing the information to make a conclusion, that would be one thing because those are scientific tests, but we don't have that here.

Accordingly, the tape was potentially useful to Freeman. *See Martinez v. State*, No. 13-06-00665-CR, 2008 Tex. App. LEXIS 515, at *30 (Tex. App.—Corpus Christi Jan. 24, 2008, pet. ref'd) (not designated for publication) (State had a duty to preserve tape of field sobriety tests that was "potentially useful…Martinez testified that the tape would have shown that he did not consent to the search"). We, therefore, proceed to the third factor, which requires us to consider: (1) the degree of negligence or bad faith involved, (2) the importance of the lost evidence, and (3) the sufficiency of the other evidence adduced at the trial to sustain the conviction. *Pena*, 226 S.W.3d at 651.

**Negligence or Bad Faith**

Westmoreland testified that, at the time of Freeman's arrest, department policy did not require the copying of tapes. This policy has since been changed. Westmoreland did not see a need to copy the tape of Freeman's sobriety tests because of the intoxilyzer results and the various other clues of intoxication.

In *Martinez*, the defendant complained about the State's destruction of a tape of field sobriety tests, alleging that the tape would have shown that he did not consent to a search of his vehicle. *See Martinez*, 2008 Tex. App. LEXIS 515, at *18. Officer Lanny Swanson believed that the tape had expired before Martinez was stopped. *Id*. at *20.

Swanson testified that he would have saved the tape had one been made. *Id.* Otherwise, the department holds the tape for ninety days, unless it needs to be retained, after which the tape is reused. *Id.* Applying *Pena*, the Corpus Christi Court noted that "if the tape existed, it was reused after ninety days in compliance with state law."[3] *Id.* at *31. There was no evidence of either "bad faith on the part of the police or the prosecutor" or "intentional misconduct." *Id.*

In *Terrell*, Officer Kelly Davis was unable to locate a videotape and audiotape of an interview with Terrell or an audiotape of an interview with the victim. *See Terrell*, 228 S.W.3d at 346. Nor was Davis aware of what had happened to the tapes. *Id.* The detective who interviewed Terrell did not testify. *Id.* We held that the record contained no evidence of bad faith or intentional misconduct by the officer or prosecutors. *Id.* at 347.

Here, Westmoreland followed then existing department policy when deciding not to copy the tape. *See Martinez*, 2008 Tex. App. LEXIS 515, at *31. The record does not contain evidence of any bad faith or intentional misconduct on the part of Westmoreland or the prosecutors. *See id.*; *see also Terrell*, 228 S.W.3d at 347.

---

[3]     Article 2.135 of the Code of Criminal Procedure provides:

> Except as otherwise provided by this subsection, a law enforcement agency that is exempt from the requirements under Article 2.134 shall retain the video and audio or audio documentation of each traffic and pedestrian stop for at least *90 days* after the date of the stop. If a complaint is filed with the law enforcement agency alleging that a peace officer employed by the agency has engaged in racial profiling with respect to a traffic or pedestrian stop, the agency shall retain the video and audio or audio record of the stop until final disposition of the complaint.

TEX. CODE CRIM. PROC. ANN. art. 2.135(b) (Vernon 2005) (emphasis added).

**Importance**

Freeman argues that the tape of the sobriety tests was important to his case because, without the tape, the jury was forced to rely on Westmoreland's impressions and conclusions without having the opportunity to evaluate the accuracy of those impressions and conclusions for themselves. However, the jury was entitled to rely on Westmoreland's testimony alone when determining whether Freeman was intoxicated *See Hartman v. State*, 198 S.W.3d 829, 835 (Tex. App.—Corpus Christi 2006, pet. dism'd) ("[T]he testimony of an officer that a person is intoxicated provides sufficient evidence to establish the element of intoxication.").

Freeman also contends that Wimbish's testimony was excluded because the tape was unavailable for review. He points to the State's admission that "perhaps [the expert's] testimony could be helpful" had he reviewed a tape of the sobriety tests. Wimbish's testimony suggests that the tape could be helpful to Freeman, given that his appearance on the tape may have been inconsistent with the subsequent intoxilyzer results. However, Westmoreland's testimony suggests that the tape would not be helpful. He testified that Freeman's performance during the sobriety tests contributed to his conclusion that Freeman was intoxicated. This conclusion was confirmed by other clues of intoxication that he had observed and Freeman's intoxilyzer results, leading him to decide that a copy of the tape was unnecessary. He further testified that Freeman's appearance on the jail tape was "basically the way he was" on the roadside. The tape's significance is at least disputed. *See Martinez*, 2008 Tex. App. LEXIS 515, at *31 ("The significance of the missing tape is disputed--Swanson testified that the tape

would have helped his case, while Martinez argues it would have shown he did not consent to search"; "the second element weighs neither in favor of nor against a due course of law violation.").

**Other Evidence**

After observing Freeman "repeatedly cross[] over both sides of the stripe" and commit other traffic violations, Westmoreland suspected either "driving while intoxicated or driving while impaired." These suspicions grew stronger once he smelled alcohol on Freeman's breath and noticed Freeman's glassy eyes. The intoxilyzer results confirmed that Freeman was intoxicated.

Even without field sobriety tests, the record contains other evidence of intoxication. *See Lewis v. State*, 191 S.W.3d 335, 341 (Tex. App.—Waco 2006, pet. ref'd) ("The odor of an alcoholic beverage on Lewis's breath and his bloodshot eyes are indicators of intoxication."); *see also James v. State*, 102 S.W.3d 162, 172 (Tex. App.—Fort Worth 2003, pet. ref'd) ("Erratic or unsafe driving may furnish a sufficient basis for a reasonable suspicion that the driver is intoxicated even absent evidence of violation of a specific traffic law."). The missing tapes were not critical to whether the State could establish Freeman's guilt beyond a reasonable doubt. *See Terrell*, 228 S.W.3d at 347.

In summary, the tape of the field sobriety tests was subject to discovery. The State had a duty to preserve this evidence, which the State breached. Regarding the consequences which should flow from this breach, the State's negligence was slight. The importance of the lost evidence is conflicting. The remaining evidence is more than sufficient to establish Freeman's intoxication. Therefore, we hold that the trial court did

not abuse its discretion by refusing to submit a spoliation instruction to the jury. We overrule Freeman's second point.

## EXPERT TESTIMONY

In his first point, Freeman contends that the trial court abused its discretion by excluding Wimbish's expert testimony.

## Standard of Review

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702. Evidence derived from a scientific theory must satisfy three criteria: (a) the underlying scientific theory must be valid; (b) the technique applying the principle must be valid; and (c) the technique must have been properly applied on the particular occasion. *Kelly v. State,* 824 S.W.2d 568, 573 (Tex Crim. App. 1992); *Sanders v. State*, 191 S.W.3d 272, 277 (Tex. App.—Waco 2006), *cert. denied* 127 S. Ct. 1141, 166 L. Ed. 2d 893 (2007).

Factors affecting this determination include, but are not limited to: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such community can be ascertained; (2) the qualifications of the expert testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained

to the court; and (7) the experience and skill of any person who applied the technique on the occasion in question. *Kelly*, 824 S.W.2d at 573; *Sanders*, 191 S.W.3d at 277. We review a trial court's ruling on the admissibility of expert testimony for abuse of discretion. *See Ellison v. State*, 201 S.W.3d 714, 723 (Tex. Crim. App. 2006).

**Analysis**

At a hearing outside the jury's presence, Wimbish identified the criteria for intoxication, such as (1) "abnormal oscillation", including slurred speech, staggered gate, sway, and circular sway; and (2) "aura", meaning "the affects that one views when they see a person who is intoxicated." He testified that an individual can identify these criteria by viewing a tape of the defendant performing field sobriety tests or any other available tapes. A conclusion is formed by integrating the criteria with the individual's own "training and life-based experiences." Wimbish admitted that the jury could use their own life experience, but believed that his testimony would be helpful to the jury's decision because he could testify to the "science of the criteria" and explain what to look for on the jail tape.

From viewing the jail tape, Wimbish concluded that: (1) Freeman did not exhibit any of the intoxication criteria; and (2) "[t]here is something wrong" because a "person at a 0.14 and the clues that I've seen on the board should be decidedly intoxicated" and "[t]here should be no question about him being intoxicated." He would identify the discrepancies between the intoxilyzer results and Freeman's appearance on the jail tape.

Wimbish testified that the jail tape lasted a "few minutes" and agreed with the State that the tape depicts Freeman "[j]ust standing there" and saying "one sentence."

He was not prepared to testify to anything other than his conclusions from viewing the jail tape and did not have any information from which to draw a conclusion about the intoxilyzer results. Due to insufficient or "conflicting" information, he could not make a determination as to whether Freeman was intoxicated. He could respond to hypotheticals if presented with evidence of extrapolation.

The trial court asked whether Wimbish would testify that "what you see on the videotape does not match the results of the breathalyzer." Wimbish responded, "Something is awry." When asked about that "something", Wimbish testified:

> [T]he intoxilyzer instrument depends upon a blood-breath ratio of 2,100 to 1 in order to estimate the blood alcohol concentration. I know statutorily that has been ruled out, but the ratio ranges for the blood-breath ratios are from 800 to 1 to 3,300 to 1. The instrument assumes 2,100 to 1 ratio for everyone. If his ratio were 1,000 to 1, the 0.14 would be a 0.07.

Wimbish did not know Freeman's ratio, which would be determined by giving him alcohol, collecting breath and blood at the same time, and then measuring the ratio.

The State argued that Wimbish's testimony was not helpful to the jury because: (1) Freeman's appearance on the tape is "perfectly obvious"; and (2) the jury does not need "specialized knowledge" to decide whether "everyone at a certain level performs exactly the same", "we should expect to see different things on the video", or a person's "appearance goes with their test".

Freeman argued that Wimbish's testimony would "partially" address whether he was intoxicated but would also explain how a person with Freeman's intoxilyzer results "would have reacted in the video and the symptoms." The trial court noted that Wimbish had not provided an opinion as to whether Freeman was intoxicated, but his

testimony that "something is awry" suggests either that Freeman was not intoxicated or "the machine is wrong." The State was concerned that this testimony would cause the jury to assume that something was wrong with the machine or that a blood test might have been different or more accurate. Freeman argued that Wimbish's experience with observing people would enable him to tell the jury what to look for and what conditions, criteria, and standards to use when determining whether Freeman was intoxicated.

The trial court expressed difficulty with Wimbish's testimony that "something is awry"; thus, "there is something wrong about something." The trial court believed that Freeman was attempting to offer testimony that the test is wrong. It excluded Wimbish's testimony.

On appeal, Freeman contends that Wimbish's testimony would have helped the jury "understand[] the results of the field sobriety tests, Freeman's appearance on the jail video, the assumptions behind the science of the intoxilyzer machine, tolerance to alcohol, and how these factors might weigh on [its] decision whether Freeman was intoxicated." The State responds that Wimbish's testimony was neither helpful nor reliable because: (1) he failed to explain the basis for his belief that "something is awry"; (2) he lacked any "basis for believing that [Freeman's] blood-breath ratio was different from the assumed ratio"; (3) he had nothing to review that would enable him to apply his "training in field sobriety tests or intoxicated behavior analysis"; and (4) the jury did not need expert testimony to determine whether the clues of intoxication were present.

In *Platten v. State*, No. 12-03-00038-CR, 2004 Tex. App. LEXIS 588 (Tex. App.—Tyler Jan. 21, 2004, pet. ref'd) (not designated for publication), the trial court excluded Wimbish's testimony "about [Platten's] appearance on the videotape and whether the factors of intoxication were identifiable from the videotape." *Platten*, 2004 Tex. App. LEXIS 588, at *5. No field sobriety tests had been performed. *See id*. During a *Daubert* hearing, Wimbish explained that his testimony was "based on the science of forensic toxicology as it relates to alcohol and its effect on the individual through suppression or depression of the central nervous system." *Id*. at *9-10. The tape would be the "primary focus of his testimony." *Id*. at *10. He evaluated the tape "based on independently recognized principles that have been studied, applied, and peer reviewed." *Id*. He "applied certain 'objective criteria' he had derived from the criteria commonly used to determine whether a person is intoxicated." *Id*. "[W]hen questioned about whether the cited studies and peer reviews related to situations where, as here, no field sobriety tests were conducted, he answered in the negative." *Id*.

The Tyler Court noted that Wimbish failed to: (1) "establish that a rate of error could be assigned where a determination of intoxication is made from viewing a videotape and no field sobriety tests are conducted"; (2) "cite any scientific theory supporting a conclusion that intoxication can be determined solely from viewing a videotape nor could he refer the court to any literature supporting or rejecting that conclusion"; (3) present any "publications or peer-reviewed data relating to a determination of intoxication without field sobriety test data"; or (4) "establish that this method is generally accepted in the relevant community." *Id*. at *10-11. "[W]hether

[Platten] appeared intoxicated on the videotape was not outside the knowledge and experience of the average juror." *Id*. at *11. For these reasons, the trial court had properly excluded Wimbish's testimony. *See id*. at *11-12.

Freeman argues that, unlike *Platten*, field sobriety tests were actually conducted, but the tape was unavailable. We have already determined that the State did not act in bad faith by failing to retain the tape, the tape is of conflicting importance, and the record contains other evidence of intoxication. Although the circumstances are different in this case, the reasoning in *Platten* is still applicable.

Freeman next argues that Wimbish has testified in two other cases. In *Gutierrez v. State*, No. 05-05-00533-CR, 2006 Tex. App. LEXIS 2136 (Tex. App.—Dallas Mar. 21, 2006, pet. ref'd) (not designated for publication), Wimbish reviewed a tape of Gutierrez performing field sobriety tests. *See Gutierrez*, 2006 Tex. App. LEXIS 2136, at *5-6. He testified that the tests were improperly administered and explained the basis for this conclusion. *Id*. at *6. He testified that "additional clues of intoxication include slurring of speech, swaying, or inappropriate oscillation." *Id*.

In *Blanchard v. State*, No. 05-05-01194-CR, 2006 Tex. App. LEXIS 7532 (Tex. App.—Dallas Aug. 24, 2006, no pet.) (not designated for publication), Wimbish reviewed tapes of Blanchard performing field sobriety tests at both the roadside and the jail. *See Blanchard*, 2006 Tex. App. LEXIS 7532, at *9. Blanchard "demonstrated signs of intoxication on the videotape from the roadside but demonstrated no signs of intoxication on the videotape from the jail." *Id*. at *9-10. Wimbish reasoned that: (1) Blanchard's "eyes were able to converge", which should not happen if under the

influence of marihuana; and (2) Blanchard had horizontal gaze nystagmus, which is not caused by marihuana use. *Id*. at *10. He believed that Blanchard suffered from postprandial narcolepsy, having eaten a "large meal after many hours of being awake and tired", which causes drowsiness. *Id*. By the time he arrived at the jail, Blanchard had awakened and was able to "respond appropriately to the field sobriety tests." *Id*. Wimbish concluded that Blanchard was not intoxicated. *See id*. at *11.

Unlike the present case, neither *Gutierrez* nor *Blanchard* addresses the *admissibility* of Wimbish's testimony or involves a situation where a tape of field sobriety tests was unavailable. *Gutierrez* and *Blanchard* are inapplicable to Freeman's case.

Freeman argues that Wimbish's testimony was offered (1) not to challenge whether the intoxilyzer machine was working, but to address the science behind the machine, specifically that the machine is "based upon assumptions that would not allow for variations between individuals and could produce an inaccurate result"; and (2) to explain Westmoreland's testimony about the results of the field sobriety tests that the jury could not view and help the jury "reach[] a decision as to intoxication by explaining, from his education, training, and experience, how the jury could look at the one video they did have, the jail video, and make a more informed decision as to whether Freeman was intoxicated." In light of Wimbish's testimony that "something is awry," it appears that he would have testified that Freeman's appearance on the jail tape is inconsistent with his intoxilyzer results.

Yet, Wimbish admitted that he has previously been prohibited from testifying to a defendant's appearance without the aid of field sobriety tests. Neither did Wimbish

know Freeman's blood-breath ratio. As in *Platten*, Wimbish provided no data, scientific theory, or documentary evidence to support his position that intoxication can be determined from viewing a videotape without evidence of field sobriety tests. He made no attempt to "establish that this method is generally accepted in the relevant community." *Platten*, 2004 Tex. App. LEXIS 588, at *10-11. Moreover, whether an individual appears intoxicated is "not outside the knowledge and experience of the average juror." *Id*. at *11. The jury did not need Wimbish's testimony in order to evaluate Freeman's appearance on the jail tape.

Accordingly, we cannot say that the trial court abused its discretion by excluding Wimbish's testimony. We overrule Freeman's first point.

## DISABLED JUROR

In his third point, Freeman complains about the trial court's decision to declare a juror disabled and proceed with eleven jurors.

### Standard of Review

A juror is disabled only when he is physically, emotionally, or mentally impaired in some way that hinders his ability to perform the duties of a juror. *See Brooks v. State*, 990 S.W.2d 278, 286 (Tex. Crim. App. 1999); *see also Ricketts v. State*, 89 S.W.3d 312, 318 (Tex. App.—Fort Worth 2002, pet. ref'd). The disabling condition may result from physical illness, mental condition, or emotional state. *Reyes v. State*, 30 S.W.3d 409, 411 (Tex. Crim. App. 2000); *Ricketts* 89 S.W.3d at 318. Whether a juror is disabled is within the sole discretion of the trial court; therefore, we review this issue under an abuse-of-discretion standard. *Routier v. State*, 112 S.W.3d 554, 588 (Tex. Crim. App. 2003).

## Analysis

On the morning of trial, a juror contacted the trial court to complain of nausea, diarrhea, and vomiting. There had been an outbreak of the rotavirus at the juror's daughter's day care. The virus could last from three to eight days. Freeman wanted this juror to remain on the panel because he had used his strikes on other members of the jury in order to keep this particular juror. He requested that trial be recessed until the juror could serve. The trial court recessed for the day to await more information from the juror.

The following day, the juror's husband informed the trial court that the juror would be confined to her house and bed for several days. The trial court declared the juror disabled. Freeman objected, arguing that the disability was not of a "lasting" type and the juror could probably serve sometime the next week. Freeman explained that the juror was important to the case because she had actively participated during voir dire and would "add a lot of information and activity and deliberation" to the panel. The trial court overruled the objection.

On appeal, Freeman urges that the juror's condition did not impair her ability to serve, but merely delayed her ability to serve. Thus, he contends that the trial court should have recessed until the juror could serve.

In *Moore v. State*, 82 S.W.3d 399 (Tex. App.—Austin 2002, pet. ref'd), the Austin Court addressed whether "a stomach ailment is insufficient to render a juror disabled because such an illness is temporary." *Moore*, 82 S.W.3d at 406. Noting that other courts have upheld disability findings in cases where jurors "complained of other

*temporary* illnesses that impaired their ability to perform the functions of a juror," the Austin Court held:

> A juror's inability to come to the courthouse due to a severe gastrointestinal ailment provides some evidence of the requisite incapacity from performing the duties assigned to that juror that the trial court may consider in making a determination of disability. Although a stomach ailment is only *temporary*, it remains within the trial court's discretion to determine whether this juror had become disabled.

*Id*. at 406-07 (emphasis added); *see Hughes v. State*, 787 S.W.2d 193, 195 (Tex. App.—Corpus Christi 1990, writ ref'd) (juror suffered from nausea, headaches, and vomiting); *see also Routier*, 112 S.W.3d at 588 (juror suffered from the flu).

Here, the juror suffered from a stomach virus that caused vomiting, diarrhea, and nausea. That such an illness is of a temporary nature does not preclude a finding of disability. *See Routier,* 112 S.W.3d at 588; *see also Moore*, 82 S.W.3d at 407; *Hughes*, 787 S.W.2d at 195. We cannot say that the trial court abused its discretion by declaring the juror disabled and proceeding with eleven jurors. We overrule Freeman's third point.

The judgment is affirmed.

FELIPE REYNA
Justice

Before Chief Justice Gray,
     Justice Vance, and
     Justice Reyna
     (Chief Justice Gray concurring with note)*
     (Justice Vance dissenting with note)**
Affirmed
Opinion delivered and filed December 17, 2008
Publish
[CRPM]

\*  (Chief Justice Gray concurs in the judgment only and only to the extent that it affirms the trial court's judgment.  A separate opinion will not issue.  He notes, however, that the first nine pages of the opinion rest entirely on this Court's departure from *Arizona v. Youngblood*, 408 U.S. 51, 57-58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988), and reliance on a petition granted case from this Court, *Pena v. State*, 226 S.W.3d 634 (Tex. App.—Waco 2007, pet. granted).  The only reason to publish this decision as an Opinion is to try to build upon or justify the Court's earlier erroneous decision.  When the spoliation instruction was offered in this case the defendant offered no authority for it.  In response to the request to give an instruction that would instruct the jury to infer that the evidence on the destroyed tapes would have been adverse to the State, the Assistant District Attorney, though not citing *Yougblood* clearly and correctly articulated the proper legal standard before a spoliation instruction can be given: "you have to have a finding of bad faith, that not only was it intentionally destroyed but that it was destroyed in bad faith.  It's that bad faith element of that that lends itself to a, you know, presumption by the jury that it was then, therefore, favorable to the defendant. There has been no evidence in this case, there has been no suggestion that that was done in bad faith."  Whereupon the trial court promptly denied the requested instruction.  Under this standard, the *Youngblood* standard, which I believe is the proper and controlling standard, the trial court's decision was not error.  The specter of some higher duty to preserve evidence in Texas under this Court's articulation of the Due Course of Law Clause that imposes a higher duty than the Due Process Clause of the United States Constitution was never even suggested to the trial court.)

\*\*  (Evidence that is destroyed inevitably affects the proper administration of justice. I would hold that a law enforcement agency has a duty to preserve a videotape of a traffic stop as long as a criminal case involving a person shown on the videotape remains pending and that a defendant deprived of that potential evidence is entitled to a spoliation instruction to the jury regarding the unavailability of that evidence.  Here, not only was the defendant deprived of potentially exculpatory evidence, his ability to establish the admissibility of the proposed expert testimony was also compromised. Thus, I would reverse the judgment and remand the cause for a new trial.)