

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 02-09-00192-CR**

KEITH WILLIAM MOORE                                          APPELLANT

V.

THE STATE OF TEXAS                                               STATE

----------

FROM THE 213TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellant Keith William Moore, proceeding pro se,[2] appeals his conviction

for evading arrest or detention using a vehicle, a truck driven by Moore. For this

---

[1]*See* Tex. R. App. P. 47.4.

[2]After receiving a document from Moore entitled "Declaration of Conflict Between Attorney And Client And Motion To Remove Appointed Counsel, Counsel's Brief, And To Proceed Pro Se On Appellate Brief," we abated this

offense, Moore was sentenced to thirty years' imprisonment. Moore raises seven issues in his appellate brief. He challenges the factual sufficiency of the evidence to support his conviction and to establish that the truck was a deadly weapon. He complains of the trial court's admission of testimony that the fleeing truck caused other wrecks. He claims that the trial court abused its discretion by admitting a photograph he claims was not properly authenticated. He argues that the trial court erred by denying his request for a jury instruction on spoliation, that the State's failure to preserve clothing evidence denied him due process and a fair trial, and that the State committed errors during its closing argument that are "severe enough to warrant reversal." In a supplemental brief, Moore argues that the deadly weapon issue was not properly before the jury because it had not been joined between the State and Moore at trial. We will affirm.

## II. FACTUAL BACKGROUND

Moore's conviction for evading arrest was based on the following testimony and facts. Several witnesses testified regarding the police's attempt to pull over the truck allegedly driven by Moore, the subsequent police chase of the truck, and the ensuing manhunt that led to Moore's arrest. Because Moore challenges

---

appeal and requested that the trial court hold a hearing in compliance with *Faretta v. California*, 422 U.S. 806, 835, 95 S. Ct. 2525, 2541 (1975), and *Hubbard v. State*, 739 S.W.2d 341, 345 (Tex. Crim. App. 1987). At the hearing, the trial court admonished Moore on the dangers of self-representation, found that he was competent to represent himself, and allowed Moore to proceed to represent himself pro se. Moore thereafter filed his pro se appellate brief with this court.

the sufficiency of his conviction, we set forth the witnesses' testimony in detail below.

### A.    The Police Chase

#### 1.    Officer Honea

Officer Nicholas Honea testified that he was on patrol on December 29, 2007, and that he drove by a Motel 6 due to the high volume of criminal activity reported there. Officer Honea ran a license plate check on a green GM pickup parked in the Motel 6 parking lot, and it came back as stolen. He reported the location of the stolen truck to other officers and various officers posted themselves in strategic locations to observe the truck and anyone entering it.

Officer Honea and his partner Officer Banes positioned themselves in separate patrol cars at a Conoco station south of Motel 6. About fifteen or twenty minutes elapsed and then Officer Banes saw the green truck driving toward them. Officers Honea and Banes followed the green truck; Officer Honea pulled in behind the truck, and Officer Banes drove down the service road. According to Officer Honea, both police vehicles turned on their sirens and their overhead lights, but the green truck did not pull over.

Officer Honea's lights shone into the back of the green truck; he observed only one person, the driver, in the truck. The driver was wearing a white, fitted baseball cap with an emblem on the back of it.

The truck's driver stopped at a stoplight, and then he stepped on the gas and did a 180-degree turn. The truck ended up facing Officer Honea. Officer

3

Honea was close enough that he "could see the whites of the driver's eyes." Officer Honea saw that the driver had abnormally large ears and was wearing a white baseball cap, a hoodie, and a white muscle shirt.[3]  Officer Honea's description of the suspect was that he was "a white white male."

The green truck's engine revved,[4] and the truck traveled directly toward Officer Honea's patrol car.  Officer Honea said that he contemplated jumping out of his vehicle and running because he "was scared of either sustaining bodily injury, serious bodily injury, and/or death, whichever would come first" from the impact of the truck with his car.  As the truck accelerated towards Officer Honea, Officer Honea completely stopped his patrol car.  The truck avoided hitting the front of Officer Honea's patrol car by inches.  Despite the existence of other avenues of escape, the truck accelerated into heavy oncoming traffic, which Officer Honea considered to be deadly conduct.  Officer Honea said that the driver never made an effort to get into the correct lane of travel "to prevent anybody else from being injured from his deadly conduct."  Officer Honea testified that he was unsure of how many wrecks the driver caused because he was not the officer who worked the accidents.

Officer Honea turned around and attempted to catch up with the driver of the truck.  Another officer, Officer Tyler, announced over the radio that the stolen

---

[3]Officer Honea said that he could see the hood scrunched up behind the driver's neck and that he could not see if the shirt had sleeves on it but noted that it looked like a muscle shirt.

[4]Officer Honea agreed that the stolen vehicle was "a pretty powerful truck."

4

truck had crashed into a building, and he gave the location. Officer Honea arrived at the crash scene and saw the driver exit the truck, wearing the jacket with the hood flipped up over his head. The driver was wearing white tennis shoes and blue jeans and was fairly pale. The driver fled on foot, and Officer Honea jumped a curb in his patrol car in an attempt to follow him.[5]

A short time later, Officer Vasquez located a man suspected of being the driver of the green truck at a residence on 2305 Irion. Officer Honea went to that address and immediately recognized the person at the scene as the driver of the green truck and identified him;[6] Officer Honea also identified Moore in the courtroom.

Officer Honea learned that a hat and a jacket were found in a grill outside a residence on Irion, and Officer Honea testified that he assumed Officer Banes had found the objects. Officer Honea said that they took pictures of the hat and jacket and gave them back to Moore. Officer Honea put the hat on Moore and said that it was a perfect fit, but Moore would not put on the jacket. Officer Honea said that Moore told him that the hat and jacket were not his.

---

[5]Officer Honea explained that when he observed Moore running, he looked short because "[h]e was not standing up walking as he normally would." Moore, however, was not a short person.

[6]The in-car video from Officer Honea's car was admitted into evidence. It showed Officer Honea's pursuit of the green truck and clearly shows the driver is wearing a white baseball cap. However, it is difficult to tell from the video what clothes the driver is wearing.

The officers did not call a fingerprint expert to lift fingerprints from the truck, and they did not call anyone to obtain DNA evidence from the hat or the jacket.

Officer Honea observed the driver of the green truck commit several traffic violations during the chase: Moore failed to yield to emergency vehicles, failed to control speed, drove on the incorrect side of the street, caused several hit-and-run accidents, and hit a building and ran from the scene. From what Officer Honea observed during the pursuit, all of the acts by Moore were intentional acts to flee from the police officers using a vehicle. Officer Honea testified that the manner in which the truck was used by Moore could have caused serious bodily injury or death to other drivers in that area and that it could have caused serious bodily injury or death to Officer Honea and other officers in the area.

### 2. Officer Banes

Officer Scott Banes testified that on December 29, 2007, he was called by another officer to assist with a possible stolen vehicle. Although the possible stolen vehicle was found at the Motel 6 at 3271 North Freeway, Officer Banes met up with Officer Honea at a gas station a block south of that location. On his way to meet Officer Honea, Officer Banes drove by the Motel 6 and saw the possible stolen vehicle, which was a dark green GMC pickup truck with chrome wheels. When Officer Banes met up with Officer Honea, they discussed their strategy and then saw the stolen vehicle pull out of the parking lot at Motel 6.

Officer Banes and Officer Honea followed the stolen vehicle in their patrol cars and attempted to initiate a traffic stop on the freeway by activating the

overhead lights on both of their patrol cars. Officer Banes did not feel that the driver was evading arrest or detention while they were on the freeway because the driver took the first available exit at Northeast 28th Street. After exiting, however, the driver did not pull over even though there were safe places to pull over. At that point, Officer Banes started to think that the driver of the truck was not going to stop.

Officer Banes activated his siren three or four blocks south of Northeast 28th Street because he wanted the driver to stop right then. The driver did not stop but instead overaccelerated and spun around. The driver sat still for a few seconds and then accelerated the truck and "came flying straight towards Officer Honea['s] . . . patrol car." Officer Tyler was positioned at the right rear of Officer Honea's patrol car and considered using deadly force against the driver to protect Officer Honea. Officer Banes testified that, based on the acceleration of the green truck, if the truck had hit Officer Honea's car, the collision could have caused serious bodily injury or death to Officer Honea.

Officer Honea and Officer Banes turned around to follow the green truck, and Officer Banes put out an alert over the radio that the green truck was traveling westbound in the eastbound lanes. Officer Banes testified that the truck left rapidly, "[H]e floored it"; "[y]ou could hear the exhaust screaming." Officer Banes testified that the speed limit on that road was forty miles per hour, that he (Officer Banes) was traveling at fifty miles per hour, and that the green truck was pulling away from him "pretty quickly."

7

Officer Tyler responded to Officer Banes's radio alert and announced over the radio that the truck had attempted a turn onto Grover and had crashed into a building. Officer Banes saw that the truck had crashed into the building and that there was a "smoldering wreck." Officer Banes did not see anyone in the truck.

Officer Banes decided to set up a perimeter as other officers began calling out a description of the suspect: a white male, pale skin, thin build, white muscle shirt, and big ears. Officer Banes eventually heard that a suspect had been detained a block and a half from where the green truck had crashed. Officer Banes went to that location and saw that there was a suspect in custody who matched the description that had been given over the radio, except that he was not wearing a hoodie and a cap like the broadcast had mentioned. Officer Banes thought it was odd that Moore was wearing a tank top because the temperature was in the forties. Officer Banes identified Moore in the courtroom as the suspect that he saw detained on December 29, 2007.

Officer Banes continued the investigation by speaking with a couple who lived at 2305 Irion. He looked in their backyard and found a black hoodie and a white baseball cap in their barbecue pit. Officer Banes reviewed the photographs labeled as State's Exhibit 1 and 2 and testified that he was the one who took the photos and collected the evidence that was depicted in the photos. The fitted baseball hat fit the suspect and was returned to him at the scene. The defense showed Officer Banes a jacket, but he did not recognize it as the one that he had found on the night in question. Officer Banes could not recall whether Moore

8

denied ownership of the jacket and baseball cap, but he recalled that Moore accepted them when police returned them to him.

### 3. Officer Tyler

On the evening of December 29, 2007, Officer Michael Tyler was contacted by Officer Honea. In response, Officer Tyler went to a Motel 6 at 3271 North Freeway because Officer Honea had found an unoccupied stolen vehicle. Officer Tyler set up a north perimeter to watch the unoccupied vehicle in case anyone approached and drove it away.

At 6:34 p.m., the vehicle, which was a 2005 green GMC pickup, left the north exit and headed southbound. Officer Tyler notified Officer Honea and Officer Banes, who were set up towards the freeway, that the vehicle was headed towards them. Officer Tyler saw Officers Honea and Banes pull out behind the vehicle, and he saw Officer Honea turn on the overhead lights on his patrol car. The stolen vehicle failed to stop and kept traveling southbound through heavy traffic. Officer Tyler saw the stolen vehicle run a red light and fail to stop even though there were numerous places where he could have pulled over.

As the stolen vehicle attempted to turn eastbound onto 28th Street, the driver lost control, and the vehicle spun around 180 degrees; it was facing westbound in the eastbound lanes of traffic. Officer Honea and Officer Banes also turned onto 28th Street and attempted to block the stolen vehicle in, but the stolen vehicle accelerated and went between them, "real close by Officer

9

Honea's car," and continued westbound in the eastbound lanes of traffic (i.e., going the wrong way).

Officer Tyler took control of the pursuit from there and continued eastbound in the correct lanes of traffic. The driver of the stolen vehicle attempted to turn southbound onto Grover from 28th Street, lost control, and hit the building at 2306 Northeast 28th Street.[7] Officer Tyler saw the driver of the stolen vehicle[8] exit the driver's side of the truck and run southbound on Grover, which is near Irion Street. Officer Tyler did not see anyone else exit the truck.

After Officer Tyler saw the driver bail out of the stolen vehicle, he pulled in behind the vehicle, confirmed that there were no other people in it, and obtained a description of the driver. Officer Tyler said that the description of the driver that he put out that night was "[t]all white male, white baseball cap, dark jacket with a hoodie, blue jeans and white shoes." Officer Tyler believed that Moore had on a white shirt under his jacket. Officer Tyler testified that after the arrest, Moore was not wearing a cap, and Officer Tyler could see that he had a shaved head.

Officer Tyler testified that the following acts committed by Moore constituted dangerous acts that could cause serious bodily injury or death: running a red light in heavy traffic, losing control of a truck and spinning out 180

---

[7]Officer Tyler testified that his patrol car had an in-car video but did not capture the truck crashing into the building or the driver bailing out because it was not facing that direction.

[8]Officer Tyler identified Moore in the courtroom as the driver of the stolen vehicle.

10

degrees in heavy traffic, losing control of a truck and hitting a building, and driving into oncoming traffic during heavy traffic. Officer Tyler further testified that, in his opinion, the truck was used as a deadly weapon—that is, in the manner of its use, it was capable of causing serious bodily injury or death.

### 4. Officer Vasquez

Officer Jose Vasquez testified that on December 29, 2007, he received a dispatch to respond to Irion Street where two officers were in pursuit of a truck coming from the Motel 6 down 28th Street. Officer Vasquez's duty was to warn drivers to get out of the way because the driver of the truck was going the wrong way on 28th Street and was being pursued by officers. Officer Vasquez's understanding from radio traffic was that Moore had already tried to ram a patrol car and had come close to ramming the police officer. Based on what Officer Vasquez heard over the radio, he responded to the area where the vehicle had "wrecked out." He saw a green pickup had hit a building and noted that it matched the description of the dispatch.

Officer Vasquez had knowledge that the driver of the truck had fled on foot and that he was a white male who was seen wearing a baseball hat. Officer Vasquez started knocking on some doors and driving around the area, looking for the driver.

Officer Vasquez was flagged down by a Hispanic male in the 2300 block of Irion who said that a white male wearing a white muscle shirt had been sitting on the steps of his detached garage. Officer Vasquez said that although the

11

Hispanic male spoke mostly Spanish, Officer Vasquez determined that he was saying that the white male did not belong on his steps.

Officer Vasquez drove in the direction that the witness had flagged him down, went down about two houses, and observed a white male with a bald head and big ears who was wearing a white tank top t-shirt and blue jeans. Officer Vasquez recalled that it "was pretty cold" that night and that it was too cold to be wearing a tank top, which heightened his desire to speak with the individual. Officer Vasquez said that Moore was panting, like he had been running, and that he looked scared. Officer Vasquez approached Moore and asked him if he lived nearby. Moore pointed to a house from which a white couple was exiting, and the couple had a concerned look on their faces. Officer Vasquez confirmed that Moore did not live there.

On cross-examination, Officer Vasquez testified that the description he had heard over the radio was a white male, wearing a hoodie and a baseball cap. Officer Vasquez admitted that the man he found was not wearing a hoodie or a baseball cap.

### 5. Esmerelda Estrada

On the night of December 29, 2007, Esmerelda Estrada was in her apartment on Irion Street, lying down with her baby, when she saw a young man peek through her window and move the handle of the door to her house. Esmerelda told her husband that there was a young man outside and to go see who it was. The young man was white and had on a white sleeveless shirt (like a

12

tank top), which Esmerelda thought was strange because it was very cold outside. She did not see a hat.

### 6. Antonio Estrada

Antonio Estrada testified that he and his wife were in their living room watching television on December 29, 2007, when his wife saw someone trying to open the door. Antonio went outside to see who the person was and saw a person sitting on the stairs outside his garage.

Antonio described the person as "a white boy," who was bald headed and was wearing a tank top.[9] Antonio asked the boy what he was doing, and he said, "The cops are looking for me." Antonio heard police cars going around the neighborhood and a helicopter flying overhead. Antonio told the boy "to get out of here," and he left. Antonio said that a squad car had been sitting nearby, pointing its lights toward his garage, so the police immediately caught the boy. Antonio testified that the man whom the police arrested was the same boy that Antonio had seen sitting on the stairs outside his garage. Antonio said that he recalled Moore because he had seen him "face to face."

After the police left, Antonio went out to his grill and found a hat and a shirt that did not belong to him. Antonio told the police that he found the jacket and the hat.

---

[9] Antonio identified Moore in the courtroom as the boy he had seen on his stairs.

13

**B.     Moore's Mother**

Diana Hooper, Moore's mother, admitted that she did not know anything about the offense that Moore was on trial for and that she was testifying because he is her son and because she does not want to see anything bad happen to him. She testified that Moore was undergoing chemotherapy in December 2007 and that it made him "really, really hot one minute, wanting the air on, to really, really cold, wanting the heat on. He would go outside without a jacket." Hooper testified that Moore also experienced shortness of breath and heavy breathing because the chemo made him "really sick." She said that he "was too sick to do much of anything." Hooper did not know why Moore would have been hiding in the Estradas' backyard because the side effects from the chemo would not have caused him to wander into people's backyards.

**C.     Disposition**

After hearing the above evidence, the jury found Moore guilty of the offense of evading arrest or detention using a vehicle and assessed his punishment at thirty years' confinement. The trial court sentenced Moore accordingly. This appeal followed.

### III. SUFFICIENT EVIDENCE SUPPORTS MOORE'S CONVICTION

In his first issue, Moore argues that the evidence is factually insufficient to support his conviction for evading arrest or detention using a motor vehicle. Specifically, Moore argues that there was "very little evidence showing that he

14

was the suspect driver." In his second issue, Moore argues that the evidence is factually insufficient to support a finding that the truck was a deadly weapon.

## A.      Standard of Review

The Texas Court of Criminal Appeals recently abrogated the factual sufficiency standard of review. The court held in *Brooks v. State*, No. PD-0210-09, 2010 WL 3894613, at *14 (Tex. Crim. App. Oct. 6, 2010), that there is no meaningful distinction between the factual sufficiency standard of review and the legal sufficiency standard of review; both apply the *Jackson v. Virginia* standard. 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Accordingly, we analyze Moore's factual sufficiency challenges by viewing all of the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

## B.      Law on Evading Arrest or Detention with a Vehicle

A person commits the state jail felony offense of evading arrest if he intentionally flees, in a vehicle, from a person that he knows is a peace officer lawfully attempting to arrest or detain him. *See* Tex. Penal Code Ann. § 38.04(a), (b)(1) (Vernon 2003); *Guillory v. State*, 99 S.W.3d 735, 741 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).

15

### C.    Law on Deadly Weapon

A deadly weapon is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury."  Tex. Penal Code Ann. § 1.07(a)(17)(B) (Vernon Supp. 2010).  To determine whether the evidence supports a deadly weapon finding in cases involving motor vehicles, we conduct a two-part analysis.  *Hilburn v. State*, 312 S.W.3d 169, 177 (Tex. App.—Fort Worth 2010, no pet.) (citing *Sierra v. State*, 280 S.W.3d 250, 255 (Tex. Crim. App. 2009)).  We first "evaluate the manner in which the defendant used the motor vehicle during the felony."  *Sierra*, 280 S.W.3d at 255.  We then "consider whether, during the felony, the motor vehicle was capable of causing death or serious bodily injury."  *Id.*

In examining the manner in which the defendant operated the vehicle, we evaluate whether the driving was reckless or dangerous.  *Id.*  We consider several factors in examining whether a defendant's driving was reckless or dangerous:  (1) intoxication; (2) speeding; (3) disregarding traffic signs and signals; (4) driving erratically; and (5) failure to control the vehicle.  *Id.* at 255–56.

### D.    Sufficiency Analyses

#### 1.    Sufficient Evidence Exists to Support Moore's Conviction

With regard to Moore's sufficiency challenge to his conviction, the record, as set forth above, contains testimony from several officers regarding their pursuit of Moore while he was driving the stolen green truck.  The record reveals that Officer Honea and Officer Banes had their patrol cars' overhead lights turned

16

on as they pursued Moore from the freeway onto the exit for Northeast 28th Street.  As the officers followed him, after he took the exit for Northeast 28th Street, they also turned on their sirens. Moore stopped at a stoplight briefly before accelerating and doing a 180-degree turn.  Instead of stopping at that point because he was now facing the wrong direction, into traffic, Moore drove right toward Officer Honea's patrol car.  He was so close that Officer Honea "could see the whites of his eyes."  Moore accelerated into heavy oncoming traffic to get away from the officers who were pursuing him.  Moore crashed the truck into a building and then fled on foot.  Officer Tyler saw the driver exit the truck; no other person exited the truck.  Officer Tyler broadcast a description of the driver.

When police apprehended Moore, he was out of breath and appeared scared; just moments before that, Moore had told Mr. Estrada that the police were looking for him.  Officer Honea identified Moore at the scene as the driver of the green truck, and both Officer Honea and Officer Tyler identified Moore in court as the driver of the green truck.  Officer Honea also testified that all of the acts that he observed Moore commit during the pursuit were intentional acts to flee from the police officers while using a vehicle.  Moreover, the record, as a whole, reveals that Moore had numerous opportunities to pull over but instead chose to flee from the officers, in spite of their flashing lights and blaring sirens indicating that they wanted to detain him.

17

Viewing the evidence in the light most favorable to the prosecution, a rational factfinder could have determined beyond a reasonable doubt that Moore was the driver of the green truck and used the truck to intentionally flee from Officers Honea, Banes, and Tyler, who were lawfully attempting to arrest or detain him. *See* Tex. Penal Code Ann. § 38.04(a), (b)(1); *Vann v. State*, 216 S.W.3d 881, 889 (Tex. App.—Fort Worth 2007, no pet.) (holding that evidence was legally sufficient to support jury's verdict that appellant fled from police officers who were legally attempting to detain him; during a high-speed chase, officers spotted appellant slide into the driver's seat and take control of the vehicle for a few miles before the engine blew). We overrule Moore's first issue.

## 2. Sufficient Evidence Exists to Support the Deadly Weapon Finding[10]

With regard to Moore's sufficiency challenge to the deadly weapon finding, the record contains overwhelming evidence that Moore drove the truck in a reckless or dangerous manner and that the truck was capable of causing death or serious bodily injury. The record demonstrates that Moore drove in a reckless

---

[10]In his supplemental brief, Moore argues that the deadly weapon issue was not properly before the jury because it had not been joined between the State and Moore at trial. Specifically, Moore contends that the State did not read the deadly weapon notice before the jury and that he did not enter a plea of true or not true before the jury. Moore's arguments are not supported by the record. The indictment in the record before us contains a deadly weapon notice. The record states that the prosecutor read the indictment while the jury was present and that Moore entered a plea of "not guilty." At the conclusion of the trial, the jury found from the evidence beyond a reasonable doubt that Moore used or exhibited a deadly weapon. Because the deadly weapon issue was properly before the jury, we overrule Moore's sole supplemental issue.

or dangerous manner when he failed to control his speed and when he overaccelerated the truck and spun around, as well as when he crashed the truck into a building; when he drove into oncoming heavy traffic in the wrong lane and never made an effort to get into the correct lane; when he drove directly at Officer Honea's patrol car and missed hitting the front of it by inches; and when he caused several accidents and drove away from them. The record also reveals that the green truck, which was described as "a pretty powerful truck," was capable of causing death or serious bodily injury because Officers Honea, Banes, and Tyler all testified that the manner in which Moore drove the truck—by driving it at Officer Honea's patrol car and into heavy oncoming traffic—could have caused death or serious bodily injury. Specifically, Officer Honea testified that he was scared he would sustain serious bodily injury or death when Moore drove the truck toward his patrol car.

Viewing the evidence in the light most favorable to the prosecution, a rational factfinder could have determined beyond a reasonable doubt that Moore used the green truck in a manner capable of causing death or serious bodily injury. *See* Tex. Penal Code Ann. § 1.07(a)(17)(B); *Sierra*, 280 S.W.3d at 256 (holding evidence of deadly weapon legally sufficient when defendant exceeded speed limit, failed to maintain control of his SUV, and in fact caused serious bodily injury to another); *Cook v. State*, No. 02-09-00036-CR, 2010 WL 3504222, at *4–5 (Tex. App.—Fort Worth Sept. 9, 2010, no pet. h.) (holding that evidence was legally sufficient to support trial court's deadly weapon finding when

19

defendant was driving while intoxicated, was speeding, and did not apply her brakes prior to or after veering off the road and running into a person).  We overrule Moore's second issue.

### IV. PHOTOGRAPH WAS PROPERLY AUTHENTICATED

In his fourth issue, Moore argues that the trial court abused its discretion by admitting State's Exhibit 1, a photograph depicting Antonio Estrada's grill with a shirt on it, over his objection that it had not been properly authenticated.

A trial court's decision as to whether evidence is properly authenticated is reviewed under the same abuse of discretion standard as the admissibility of evidence.  *See Angleton v. State*, 971 S.W.2d 65, 67 (Tex. Crim. App. 1998); *Smith v. State*, 683 S.W.2d 393, 404 (Tex. Crim. App. 1984); *Reavis v. State*, 84 S.W.3d 716, 719–20 (Tex. App.—Fort Worth 2002, no pet.).  The authentication requirement for admissibility does not require the predicate from someone with personal knowledge of where or when the photograph was made; rather it "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  Tex. R. Evid. 901(a); *Reavis*, 84 S.W.3d at 719.  Rule 901(b) provides a nonexclusive list of methods for authenticating evidence that includes testimony of a witness with knowledge that a matter is what "it is claimed to be," and distinctive characteristics of the evidence, including "appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances."  Tex. R. Evid. 901(b)(1), (4); *Reavis,* 84 S.W.3d at 719.  Testimony that the photograph is what

20

it purports to be is sufficient to authenticate the photograph; the accuracy of the testimony is a question for the jury. *Reavis*, 84 S.W.3d at 719. If a verbal description of the material portrayed is admissible, then a photograph reflecting the verbal testimony is admissible. *Wilkerson v. State*, 726 S.W.2d 542, 547 (Tex. Crim. App. 1986), *cert. denied*, 480 U.S. 940 (1987). A trial court does not abuse its discretion by admitting evidence when it reasonably believes that a reasonable juror could find that the evidence has been authenticated or identified. *Druery v. State*, 225 S.W.3d 491, 502 (Tex. Crim. App.), *cert. denied*, 552 U.S. 1028 (2007).

Here, the record contains the following with regard to the State's authentication of State's Exhibit 1 by Mr. Estrada:[11]

> [PROSECUTOR]: Your Honor, may I approach?
>
> THE COURT: Yes, you may.

> Q. Mr. Estrada, I'm showing you what's been previously marked as State's Exhibit No. 1 and State's Exhibit No. 2. Do you recognize these?
>
> A. That is a big grill that I have in my house to grill meat.
>
> Q. Does State's Exhibit 1 and State's Exhibit 2 fairly and accurately depict your grill as it appeared on December 29th, 2007?
>
> A. Yes.
>
> Q. Thank you very much.

---

[11]The record reflects that Mr. Estrada spoke Spanish and that the parties utilized an interpreter during his questioning.

21

Thereafter, the State attempted to offer two photographs of the grill—State's Exhibit 1 and 2—into evidence, and Moore's counsel asked to take Mr. Estrada on voir dire.

BY [DEFENSE COUNSEL]:

Q. In State's Exhibit 2, is this part of your grill?

A. The hat, no. The other, yes.

Q. Is that part of your grill?

A. No. I cannot really look at it very well because of the light it reflect[s]. But after the police left, I went to see into it, and there was the hat and there was this shirt. But that's my grill, yes. It is my grill.

Q. What is this?

A. There was a hat and a shirt that was in there.

Q. Is this the shirt?

A. I don't know. I cannot really make it out. I cannot tell you right now what it is because I cannot make it out.

[DEFENSE COUNSEL]: Your Honor, I'll object to State[']s Exhibit 1 on the basis that it's not showing his grill as he recognizes it.

Q. And with regard to State's Exhibit 2, was this hat in the grill when you looked at it?

A. Yes.

Q. When was that?

A. When was that? When I saw him.

Q. You were looking at this hat when you were looking at him in the garage?

22

A.  No.  He wasn't wearing a hat.  At that time he was bald headed.

[DEFENSE COUNSEL]:  Your Honor, I'm going to object to State's Exhibit 1 and 2 on the basis it does not appear to be the grill that he described that he – it appears to be pictures of something in something that he can't describe.

THE COURT:  All right.  Let me see the exhibits.
All right.  Your objections are overruled.
State's Exhibits 1 and 2 are admitted into evidence.

Moore thereafter requested a running objection, which the trial court granted.

As set forth above, Mr. Estrada testified on direct examination that the photographs accurately depicted his grill with a hat and a shirt[12] on it on the night in question, which was enough by itself to authenticate the photograph.  *See Reavis*, 84 S.W.3d at 719 (recognizing that the ultimate test for authentication is that the proponent of the evidence has made a showing sufficient to permit a reasonable juror to find that the evidence is what its proponent claims).  Defense counsel's questions on voir dire concerning the hat and the shirt did not undermine or refute Mr. Estrada's testimony that the picture accurately depicted his grill on the night in question; although the photograph of the grill was taken from a side angle, making it difficult to see the details of the objects on the grill, Mr. Estrada testified that State's Exhibit 1 was an accurate portrayal of how his grill looked when he found the items on it.

---

[12]Because Mr. Estrada referred to the item as a "shirt," we will use that term when referring to his testimony, even though the officers described the item as a "jacket" or a "hoodie."

23

Even assuming that the trial court abused its discretion by admitting State's Exhibit 1, any error was harmless. *See Quinonez-Saa v. State*, 860 S.W.2d 704, 707 (Tex. App.—Houston [1st Dist.] 1993, pet. ref'd) (holding that error, if any, from the admission of the autopsy photographs was harmless because the photographs were not the only evidence that established the close range of the gunshot wound to the complainant's head). Officer Honea testified without objection that he saw Moore wearing a hat and a jacket (referred to by Mr. Estrada as a "shirt") while he was driving; that a hat and a jacket were found on a grill at a residence; that he gave Moore the hat and the jacket, and Moore accepted them; and that the hat fit Moore, but Moore would not put on the jacket. Because a photograph is merely a graphic portrayal of facts that may be proved by oral testimony and because unobjected-to testimony at trial indicated Moore was wearing a jacket or a "shirt"—like the one found in the grill—while he was driving, any error in admitting the photograph was harmless. *Cf. Davis v. State*, 687 S.W.2d 78, 82 (Tex. App.—Dallas 1985, pet. ref'd) (holding that trial court did not err by admitting photographs that depicted complainant's condition because several witnesses testified to complainant's appearance without objection). We therefore overrule Moore's fourth issue.

## V. NO JURY INSTRUCTION ON SPOLIATION MANDATED UNDER THE CIRCUMSTANCES

In his fifth issue, Moore argues that the trial court erred by denying his request for a jury instruction on spoliation because the Fort Worth Police

24

Department failed to preserve the hat and the jacket that were involved in the case.

Any federal constitutional duty to preserve evidence is limited to evidence that might be expected to play a significant role in the suspect's defense. *California v. Trombetta*, 467 U.S. 479, 488, 104 S. Ct. 2528, 2534 (1984). "To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489, 104 S. Ct. at 2534 (citation omitted). "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 337 (1988).

Here, the record reveals that Officer Honea testified, "We took pictures of the hat and jacket. And after we were done taking pictures of it, we gave it back to the arrested person." Thus, according to police, Moore received possession of the items that he claims police should have preserved. No evidence exists in the record that police destroyed or spoliated evidence; they gave the items to Moore at the scene. Furthermore, neither the shirt nor the hat constitute exculpatory evidence; that is, even if these items had contained DNA not belonging to Moore, it would not prove Moore had not worn them on the night in question. A defendant is not entitled to a spoliation instruction when there is no showing that

25

the evidence was exculpatory or that there was bad faith on the part of the State in connection with its loss. *White v. State*, 125 S.W.3d 41, 43–44 (Tex. App.—Houston [14th Dist.] 2003), *pet. ref'd*, 149 S.W.3d 159 (Tex. Crim. App. 2004). We hold that the trial court did not abuse its discretion by denying Moore's request for a spoliation instruction. We overrule Moore's fifth issue.

## VI. FAILURE TO PRESERVE ARGUMENTS

In his third issue, Moore argues that the trial court erred by overruling his lack-of-personal-knowledge objection to Officer Honea's testimony that the green truck had caused other wrecks that evening. Officer Honea testified that he was "unsure of how many wrecks [Moore's driving] caused, because I'm not the one who worked the wrecks." Officer Honea later testified, however, that he saw the driver of the green truck do the following:

> Failing to yield to emergency vehicles, for one. Operating a motor vehicle at a point to lose control -- failure to control speed. Drove on the incorrect side of the street. Several hit-and-run accidents. Like I said, I'm unsure of the number of accidents the vehicle caused. And also hit a building and ran away from the scene after hitting the building.

In order to preserve error regarding the admission of evidence, an appellant must make a timely objection to each instance in which the objectionable testimony is elicited. *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991). Any error in the admission of evidence is cured when the same evidence comes in elsewhere without objection. *Id*. Thus, when there is an objection to the first question on a particular subject, but no objection to

26

subsequent questions on the same subject, no error is preserved regarding the admission of testimony on that subject. *Id*. at 859–60; *see also Salazar v. State*, 131 S.W.3d 210, 214–15 (Tex. App.—Fort Worth 2004, pet. ref'd). Because Officer Honea later testified without objection to the same facts Moore now complains of, this complaint is not preserved for our review. We overrule Moore's third issue.

In his sixth issue, Moore argues that the State's failure to preserve the shirt/jacket and hat that was found on the night of the offense denied him due process and a fair trial. Moore admits that he did not raise a constitutional objection at trial but claims that under *Freeman v. State*, 276 S.W.3d 630, 633–34 (Tex. App.—Waco 2008), *pet. granted, judgm't vacated*, 286 S.W.3d 370 (Tex. Crim. App. 2009), his request in asking for the spoliation instruction is sufficient to preserve his complaint for review. Moore's reliance on the first *Freeman* case is misplaced because on remand from the Texas Court of Criminal Appeals, the Waco Court of Appeals held that Freeman's request for a spoliation instruction did not preserve his constitutional complaint. *Freeman v. State*, No. 10-07-00363-CR, 2010 WL 199879, at *1 (Tex. App.—Waco Jan. 20) (op. on remand, not designated for publication), *pet. stricken*, 2010 WL 3431134 (Tex. Crim. App. 2010). Thus, because Moore failed to raise this due process complaint in the trial court, it is not preserved for our review. Tex. R. App. P. 33.1(a)(1); *Mosley v. State*, 983 S.W.2d 249, 265 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999) (requiring a party to present to the trial

27

court a timely request, objection, or motion that states the specific grounds for the desired ruling in order to preserve the complaint for appellate review).

In his seventh issue, Moore argues that during the State's summation and final argument in the guilt/innocence phase, the State committed errors that were so severe they warrant reversal.[13] Moore did not object to any of the statements he now complains of that were made by the State during its closing arguments. Consequently, these complaints are likewise not preserved for our review. *See* Tex. R. App. P. 33.1(a)(1).

## VII. CONCLUSION

Having overruled all seven of Moore's issues, we affirm the trial court's judgment.

SUE WALKER
JUSTICE

PANEL: DAUPHINOT, GARDNER, and WALKER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: November 18, 2010

---

[13]Moore contends that the State twice told the jury that he had been found in the Estradas' backyard and that the State told the jury that no one—including Moore's mother, friends, neighbors, or relatives—took the stand and had "one good thing" to say about him.